CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 0 7 2012

JULIA C. DUDLEY, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | |
|---|---|
| DEVIN HAMDEN, | ) |
| | ) Case No. 7:12-cv-00003 |
| Plaintiff, | ) |
| | ) |
| v. | ) MEMORANDUM OPINION |
| | ) |
| TOTAL CAR FRANCHISING CORP., | ) |
| d/b/a COLORS ON PARADE, | ) By: Hon. James C. Turk |
| | ) Senior United States District Judge |
| Defendant. | ) |

The Plaintiff, Devin Hamden ("Hamden"), filed this action for declaratory judgment against Defendant, Total Car Franchising Corp. d/b/a/ Colors on Parade ("Total"), seeking a declaration of his rights and obligations under two agreements, a Limited Rights Franchise Agreement ("Franchise Agreement") and a Non-Competition and Confidentiality Agreement ("Non-Competition Agreement"), he signed in order to become a franchisee of Total in May 1996. The parties agreed to have a one-day nonjury trial. Subsequently, both parties filed proposed findings of fact and conclusions of law. The Court, having heard and considered the testimony and evidence, makes the following findings of fact and conclusions of law and enters judgment in favor of Hamden but denies Hamden his requested attorneys' fees and costs.

I. **Standard of Review**

In a nonjury trial the Court is required to make specific findings of fact and separately state its conclusions of law. Fed. R. Civ. P. 52(a)(1). It is the duty of the trial judge, sitting without a jury, to appraise the testimony and demeanor of witnesses, as well as to weigh the evidence and choose among conflicting inferences and conclusions those that seem most reasonable. See Burgess v. Farrell Lines, Inc., 335 F.2d 885, 889-90 (4th Cir. 1964). A trial

court must do more than announce statements of ultimate fact. <u>United States ex rel. Belcon, Inc. v. Sherman Constr. Co.</u>, 800 F.2d 1321, 1324 (4th Cir. 1986). However, the court is not required "to make findings on all facts presented or to make detailed evidentiary findings…. The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." <u>Darter v. Greenville Cmty. Hotel Corp.</u>, 301 F.2d 70, 75 (4th Cir. 1962).

## II. Findings of Fact

The Court makes the following factual findings based on the testimony of Devin Hamden and Jeffery Cox, Chief Executive Officer of Total, and documents admitted into evidence at trial. Hamden became a franchisee of Total on May 9, 1996. At that time he was a resident of Roanoke, Virginia, but he currently resides in Bluefield, Virginia. Total is a franchisor in the automobile restoration business. On May 9, 1996, Total was a corporation with its principal place of business in Duluth, Georgia, but it is currently a South Carolina corporation with its principal place of business in South Carolina. Total provides both paint and paint-less dent repair and restoration services. Hamden, however, provided only paint-less dent repair. For the duration of his Franchise Agreement, he never used paint, except to do minor touch-ups. If paint work were required he would refer the customer to another Total technician who did paint restoration.

Sometime in the early 1990's, Hamden met Phil Barker ("Barker") through a mutual acquaintance. Hamden learned that Barker worked for Total as a franchisee doing paint-less dent repair. With an educational background in computer science, Hamden had no knowledge or experience in dent repair. In 1995, Hamden informally apprenticed himself to Barker. On May

31, 1995, Hamden was provided with a Limited Rights Franchisee Candidate Agreement Form. The form indicated Hamden would perform "PDR Only." (Dkt. No. 32-1, at 1). At trial Hamden testified that PDR stood for paint-less dent repair. During this informal apprenticeship Hamden traveled with Barker and serviced Barker's accounts. In the process of so doing Hamden learned the business of paint-less dent repair. All of Hamden's knowledge and experience in paint-less dent repair was acquired during this informal apprenticeship.

To become a franchisee Hamden signed a Limited Rights Franchise Agreement ("Franchise Agreement") and a Non-Competition and Confidentiality Agreement ("Non-Competition Agreement"). These two agreements, with the handwritten additions and explanatory letter, constitute the only agreement between the parties and define their respective rights and obligations.

Prior to signing these agreements, Hamden negotiated some of the agreement terms. He also consulted with an attorney prior to entering into the agreements. Specifically, Hamden lowered the royalty fee due under the Franchise Agreement from 40% to 27%. Hamden also inserted a handwritten addendum to the Franchise Agreement stating that the agreement was supplemented by a May 2, 1996 letter ("Letter") sent by Thomas R. Hambrick, then-director of franchise compliance. The Letter stated:

> Secondly, you are concerned about being able to use your previous working knowledge and expertise in the event you would leave Colors on Parade. We assure you, as noted in the Non-Competition form you signed, that your previous knowledge, training and skills are yours. The issue that Colors on Parade has is with the trade secret and proprietary information that you have learned and have been trained by during your time with the company. We realize that most people who become part of our team have previous skills and expertise, and it is not our intent to deprive others of that or to attempt to take that away from them.

Hamden also added a handwritten addition to the Non-Competition Agreement that stated: "Any knowledge, training and skills that I acquired prior to the signing of this agreement are mine, and are [not] subject to the time and geographic restrictions of this agreement."

The key terms of the agreements were as follows. Under the Franchise Agreement, Hamden agreed to provide "quality on-location appearance technology for a broad variety of means of transportation that have paint on them." However, "appearance technology" was not defined in the agreement. The Franchise Agreement did not explicitly specify a territory, i.e., by naming a city or providing a map for which Hamden was responsible, but rather included a list of 16 dealerships in (a) Virginia: Blacksburg, Christiansburg, Hillsville, Pulaski, Rich Creek, Shawsville, and Tazewell; and (b) West Virginia: Bluefield, Beckley, and Princeton. (Dkt. No. 32-6). Furthermore, the terms used to explain the extent of Hamden's geographic area – metropolitan statistical area and statistical marketing area – were not defined in either agreement between the parties. The term of the Franchise Agreement was 15 years.

The Franchise Agreement also included a covenant not to compete, in Section 9, entitled "Rights and Duties of Parties Upon Expiration, Termination or Non-Renewal," which stated:

> **Post Term Competition-** For 2 years following the termination of this Agreement neither you nor any of your partner(s) or shareholder(s) shall engage in, or have any financial or management interest, directly or indirectly either as an officer, proprietor, agent, employee, director, shareholder, franchisee or partner, in any other mobile of fixed paint restoration business in the standard metropolitan statistical area in which the territory is located.

(Dkt. No. 32-2, at § 9). The Non-Competition Agreement provided a more detailed version of the covenant not to compete. Specifically, it prohibited competition "[d]uring the term of the Franchise Agreement" and provided that:

> If the Franchise Agreement is terminated before its expiration date, or if you assign or transfer your interest in the Franchise Agreement, to any person or business organization except according to Section 7 of the Franchise Agreement, then You covenant, for a period of 2 years after termination, transfer or assignment, not to engage as an owner, operator, or in any managerial capacity, in any business engaged in the same or similar type of appearance technologies within the metropolitan statistical area in which the Franchise Agreement's Designated Marketing Area is located, other than as an authorized franchisee or employee of another Colors on Parade franchise.

(Dkt. No. 32-4, at 1). The Non-Competition Agreement also contained a separate non-solicitation provision, which stated:

> During the term of the Franchise Agreement and for 2 years after its termination or after its assignment or transfer, You agree that You will neither directly nor indirectly solicit, induce, divert or take away any customer within the statistical marketing area in which the DMA is located where you actually served during the term of this Agreement.

(Id.). Lastly, the Non-Competition Agreement contained a non-disclosure provision, which stated:

> During the term of the Franchise Agreement and thereafter, you agree not to communicate directly or indirectly, divulge to or use for your benefit or the benefit of any other person or legal entity, any trade secrets which are proprietary to Colors on Parade or any information, knowledge or know-how deemed confidential under Section 5 of the Franchise Agreement, except as we permit. If there is any termination of this Agreement, You agree that you will never use our confidential information or trade secrets, in the design, development or operation of any business specializing in appearance technologies as Colors on Parade applies them. You agree that if you engage as an owner, operator or in any managerial capacity in any business like that, you will assume the burden of proving that you have not used our confidential information or trade secrets.

(Id.).

During the pendency of the Franchise Agreement Hamden grew his territory to approximately 30 area car dealerships. These new businesses were not originally enumerated in the partial Assignment of Rights and were located in Tazewell County, Virginia; Beckley, West Virginia; Mercer County, West Virginia; Princeton, West Virginia; Cedar Bluff, Virginia; Pounding Mill, Virginia; and Richlands, Virginia. Despite this, Total never updated Hamden's Franchise Agreement or otherwise clarified its geographic boundaries. At the time he ceased being a Total franchisee, Hamden was the only Total technician performing paint-less dent repair in West Virginia, although others provided paint restoration services. Furthermore, there was no area developer assigned to West Virginia.

The Franchise Agreement term ended on May 9, 2011, but Hamden continued working as a franchisee because he did not realize the term had ended. Hamden testified, and Cox agreed, that at no time did Hamden commit any of the acts listed in Section 8 of the Franchise Agreement to terminate the Agreement. On October 12, 2011, Total emailed Hamden reminding him to renew his franchise.[1] On November 30, 2011, having now realized his Franchise Agreement term had ended, Hamden notified Total that he would not renew the franchise. After receiving a call from Total he completely ceased operations on December 1, 2011.

### III. Discussion

#### A. Applicability of Restrictive Covenants

The issue before the Court is whether the restrictive covenants in the Franchise and Non-Competition Agreements apply to Hamden's circumstances. To make this determination the Court considers whether the terms "termination" and "expiration" have the same or different meanings under the Franchise and Non-Competition Agreements. If the terms have different

---

[1] Per the terms of the Franchise Agreement the correct period to renew the Agreement had passed. (Dkt. No. 32-2, at ¶ 2) ("You may, at your option, renew this Agreement provided you have: delivered to us written notice at least three but not more than six months before this Agreement's expiration....").

6

meanings the Court must then decide whether Hamden terminated his Franchise Agreement or whether it expired. In general, Plaintiff argues that the restrictive covenants do not apply to him because (1) they apply only in the event a franchisee terminates the Franchise Agreement, which he did not do, and (2) they apply only to paint restoration techniques, while he exclusively performs paint-less dent repair work. Defendant argues that all the restrictive covenants should be read to apply upon termination, where termination is interpreted broadly to include expiration.

### 1. *Section 9 of the Franchise Agreement*

When interpreting a contact under Virginia law,[2] the court first looks to the language of the agreement and gives the words "their usual, ordinary, and popular meaning." City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., 628 S.E.2d 539, 541 (Va. 2006) (quoting D.C. McClain, Inc. v. Arlington Cnty., 452 S.E.2d 659, 662 (Va. 1995)). Further, "[n]o word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and their is a presumption that the parties have not used words needlessly." Id. If the language of the contract is unambiguous, parol evidence is not considered when determining the intent of the parties. Aetna Cas. & Sur. Co. v. Fireguard Corp., 455 S.E.2d 229, 232 (Va. 1995) ("When a contract is complete on its face and is plain and unambiguous in its terms, a court is not free to search for its meaning beyond the contract itself."). To the extent ambiguities exist, the contract is construed against the drafter. Joseph P. Bornstein, Ltd. v. Nat'l Union Fire Ins. Co., 828 F.2d 242, 245 (4th Cir. 1987).

Defendant's argument that expiration is but one form of termination is not persuasive in the context of the specific contract before the Court. The Franchise Agreement provides in a

---

[2] Although Georgia law governs the contract terms generally, Total and Hamden agreed that Virginia law applies to the interpretation of the restrictive covenants. (Dkt. No. 32-2, at § 13) ("Interpretation ...[of] the restrictive covenants contained in this Agreement ... shall be construed in accordance with the laws of state(s) where the restriction(s) is (are) to apply, and the laws of the state(s) will determine the enforceability of the covenants to be performed in those state(s)."). The restrictions apply in Virginia, thus Virginia law governs their interpretation.

7

bolded subsection entitled "Post Term Competition" that "For 2 years **following the termination** of this Agreement ..." Hamden "shall [not] engage in ... any other mobile of fixed paint restoration business...." (Dkt. No. 32-2, at § 9) (emphasis added).[3] Defendant cites a handful of cases in which courts have held that termination includes expiration or that the terms are interchangeable. See e.g., NaturaLawn of America, Inc. v. West Group, LLC, 484 F. Supp. 2d 392, 401 (D. Md. 2007); Daniel Boone Clinic, PSC v. Dahhan, 734 S.W.2d 488, 490 (Ky. Ct. App. 1987). The Court does not find these cases instructive because contract interpretation necessarily varies with the language of the specific contract and neither of the contracts in these cases are the same as in the present case. Indeed, in Daniel Boone, the court after reviewing "the contract as a whole" held that termination means ending and rejected the plaintiff's contention that simply because the words termination and expiration were both used in the contract they must have different meanings. 734 S.W.2d at 490. In the present case, when the contract is reviewed as a whole it is clear that termination has a particular meaning that is explained in detail in Section 8 of the Franchise Agreement.

Furthermore, the Franchise Agreement between Hamden and Total is distinguishable from the contract in NaturaLawn even though both contracts use the language "termination of an agreement for any reason." 484 F.Supp.2d at 401. Unlike the contract in NaturaLawn—where the court stated that "an expiration of an agreement is a more specific type of termination," a conclusion that was not undermined by "the fact that both words appear in other provisions of the Franchise Agreement[]"—the Franchise Agreement between Hamden and Total does more than merely include both words; it provides a detailed list of conditions under which the Agreement terminates automatically and a provision for the franchisee to terminate the

---

[3] A prior bolded subsecton entitled "Your Obligations" begins "If this Agreement terminates for any reason, ..." and goes on to list requirements to be completed by the franchisee in the event of a termination. (Dkt. No. 32-2, at § 9). However, none of these requirements pertain to post-term competition.

Agreement voluntarily. Id. Therefore, unlike the court in NaturaLawn, this Court does not need to "bend over backwards" or "distort the plain meaning of these everyday terms" to find that in the Franchise Agreement before this Court termination and expiration do not have the same meaning. Id.

Having determined that termination and expiration are not synonymous, the Court must next decide whether Hamden terminated the Franchise Agreement. Although termination and expiration are never explicitly defined in a terms section because the contract has none, in the preceding section, entitled "Violation and Termination," the Franchise Agreement states the Agreement will terminate if any of the following events occurs: (1) "You make a general assignment for the benefit of creditors," (2) "You voluntarily abandon the franchised business," (3) "A petition for bankruptcy for liquidation, reorganization, or similar proceeding is filed by or against you; your real or personal property is attached or levied upon by any government official of competent jurisdiction," (4) "you are found guilty by a court ... of a felony," (5) "You make a material misrepresentation or omission under the acquisition of the franchise," (6) "You fail ... to comply with any material provisions of this Agreement," (7) "You engage in numerous business activities in a substantially unethical matter," (8) "You engage in any operation of the franchised business outside the territory," (9) "You fail to complete training in a manner to our satisfaction," (10) "You disclose our trade secrets or other confidential information," and (11) "You attempt to make an unauthorized transfer, assignment, sale or encumbrance of your right, title or interest under this Agreement." (Id. at § 8). Finally, the section provides "You may terminate this Agreement without transfer only if you are in full compliance with all of its provisions and give us 60 days notice of your intent." (Id.).

Hamden did not commit, and Cox has admitted Hamden did not commit, any of the acts that would give rise to automatic termination. Nor did Hamden notify Total of his intention to terminate the agreement. Thus, under the plain language of the Franchise Agreement, the Agreement did not terminate. Because the Franchise Agreement did not terminate, but rather expired, Section 9 does not apply and Hamden is not bound by its terms.[4]

Moreover, Section 9 does not apply because Plaintiff does not engage in paint restoration, but rather only performs paint-less dent repair.[5] Plaintiff argues Section 9 is inapplicable because Section 9 only covers a "mobile or fixed location **paint restoration** business in the standard metropolitan statistical area in which the territory is located" and Hamden operates a paint-less dent repair business. (Dkt. No. 32-2, at § 9) (emphasis added). Defendant states that "appearance technologies," as used in the industry, includes both paint restoration and paint-free dent repair. Further, because the term "appearance technology" is used in the recitals to the Franchise Agreement, Defendant argues the restrictive covenant covers both types of services. However, even assuming arguendo the Defendant's statement that "appearance technology" includes paint-less dent repair, in contract interpretation, when provisions conflict, courts should resolve "any apparent inconsistency between a clause that is generally and broadly inclusive in character, and a clause that is more specific in character" in favor of the more specific clause. Chantilly Constr. Corp. v. Dept. of Highways and Transp., 369 S.E.2d 438, 445 (Va. Ct. App. 1988) (citing Mutual Life Ins. Co. v. Hill, 193 U.S. 551, 558 (1904)). Here, the restrictive covenant in Section 9 specifies "paint restoration," which is more specific than the term "appearance technologies," used in the recitals. Thus, the term paint restoration governs and based on the plain meaning of that term it does not include paint-less dent repair; the services are

---

[4] This reading of the Franchise Agreement is further reinforced by the language of the other restrictive covenants in the Agreement, as discussed below.
[5] Even Hamden's franchise candidate form specified that he was to provide "PDR only." (Dkt. No. 32-1, at 1).

not interchangeable.[6] Thus, the Court finds the restrictive covenant does not apply to paint-less dent repair, and therefore, because Hamden only performs paint-less dent repair, he is not bound by the section's restrictions.

### 2. *Non-Compete Clause of the Non-Competition Agreement*

Again, Plaintiff argues that the non-compete clause is inapplicable because the Franchise Agreement expired rather than terminated. In the context of this particular clause, Defendant's argument that termination encompasses expiration is particularly implausible because the clause states: "If the Franchise Agreement is **terminated before its expiration date** ... You covenant, for a period of 2 years after termination ... not to engage in the same or similar type of appearance technologies ...." (Dkt. No. 32-4, at 1) (emphasis added). Thus, in order to give effect to each word in the clause, D.C. McClain, 452 S.E.2d at 662, terminated and expiration must have different meanings because if they did not this clause would be nonsensical. The language in the non-compete clause confirms the Court's reading of the terms termination and expiration in the Franchise Agreement. See Musselman v. Glass Works, L.L.C., 533 S.E.2d 919, 921 (Va. 2000) (stating the integrated business transaction principle requires courts to construe multiple documents together to divine the intent of the parties). Accordingly, the Court again finds that termination is distinct from and does not encompass expiration. Thus, because Hamden did not terminate the Franchise Agreement he is not bound by the non-compete clause in the Non-Competition Agreement.

### 3. *Non-Solicitation Clause of the Non-Competition Agreement*

Plaintiff similarly argues that he is not bound by the non-solicitation clause of the Non-Competition Agreement because the clause states it applies only "[d]uring the term of the Franchise Agreement and for **2 years after its termination** or after its assignment or transfer..."

---

[6] At trial Cox described the first Total business as "a man, a dream, and a can of paint."

11

and he did not terminate the Franchise Agreement. (Dkt. No. 32-4, at 1) (emphasis added). The plain language of the clause does not state that the non-solicitation clause survives the expiration of the contract. As illustrated by all the restrictive covenants, the drafters assigned different temporal limitations to each restrictive covenant, thus, had they wished they could have provided that the non-solicitation covenant survived the expiration of the contract. Of note, in another section, the drafters specified that Hamden was not to contest the validity of Total's Commercial Symbols "during the term of this Agreement, and after its expiration." (Dkt. No. 32-2 at § 5). The drafters did not so provide in the non-solicitation clause. Having found that termination and expiration do not have the same meaning in the Non-Competition Agreement, the Court holds that the non-competition clause does not bind Hamden because he did not terminate the Franchise Agreement.

### 4. *Non-Disclosure Clause of the Non-Competition Agreement*

The non-disclosure clause required that "[d]uring the term of the Franchise Agreement and thereafter, [Hamden] agree not to communicate directly or indirectly, divulge to or use for your benefit ... any trade secrets which are proprietary to Colors on Parade or any information, knowledge or know-how deemed confidential under Section 5 of the Franchise Agreement...." Section 5 concerns the obligations of the franchisee broadly, and with regards to conditional information, provides only that Total's Commercial Symbols belong to Total exclusively any may not be used without Total's consent. (Dkt. No. 32-2, at § 5). It does not otherwise discuss confidential information or knowledge. (Id.). Here, Hamden has represented and Defendant does not contest, that he promptly removed the decals from his truck and returned them along with all training manuals, documents, and files in his possession to Total. Thus, under the terms

of the non-disclosure clause, read in the context of the Franchise Agreement, the Court finds that Hamden has fully complied with this part of the non-disclosure clause.

The second part of the non-disclosure clause states "[i]f there is any termination of this Agreement, You agree that you will never use our confidential information or trade secrets, in the design, development or operation of any business specializing in appearance technologies as Colors on Parade applies them." Defendant appears to argue that Hamden cannot use any information acquired while working for Total "for the purpose of developing or operating a business 'specializing in appearance technologies.'" (Dkt. No. 35 at ¶ 65). However, because this sentence requires termination of the Franchise Agreement to be effective and Hamden did not terminate his Franchise Agreement, this sentence is inapplicable to Hamden. Accordingly, the Court finds that Hamden has either already complied with the non-disclosure clause or is not bound by its restrictions because he did not terminate his Franchise Agreement.[7]

### B. Attorneys' Fees

Plaintiff requests an award of attorneys' fees under the Federal Declaratory Judgment Act. Plaintiff further argues that the contract need not include a fee clause for the court to award attorneys' fees. See In re USA Commercial Mortg. Co., 802 F.Supp.2d 1147, 1179 (D. Nev. 2011) (citing Gant v. Grand Lodge of Tex., 12 F.3d 998, 1003 (10th Cir. 1993) (stating "a court has the power in a diversity case to award fees as damages under section 2202 even though they are not recoverable under state law")). Defendant counters that attorneys' fees are not appropriate in this case because to be awarded fees must be allowed under applicable substantive state law, Westwind Acquisition Co., LLC v. Universal Weather & Aviation, Inc., 668 F.Supp.2d 749, 754 (E.D.Va. 2009), and under either Virginia or Georgia law attorneys' fees are not

---

[7] Having held that the restrictive covenants in the Franchise Agreement and Non-Competition Agreement do not apply to Hamden because he did not terminate his Franchise Agreement and nor does he engage in paint restoration services, the Court need not reach the enforceability of the restrictive covenants themselves.

permitted, Russell Cnty. Dept. of Soc. Servs. v. O'Quinn, 523 S.E.2d 492, 493 (Va. 2000) (holding attorneys' fees are not permitted "in the absence of a statute or contract to the contrary"); Ga. Code Ann. § 13-6-11 (stating attorneys' fees are only awarded where defendant has acted in bad faith, been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense).

Under the Declaratory Judgment Act courts may grant "[f]urther necessary or proper relief based on a declaratory judgment ... against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202. In diversity cases, such as the present case, courts may award reasonable attorneys' fees to the extent that such fees are allowed under applicable substantive state law. Western World Ins. Co. v. Harford Mut. Ins. Co., 602 F.Supp. 36, 37 (D. Md. 1985), aff'd in part, 784 F.2d 558 (4th Cir. 1986) (affirming the award of attorneys' fees without discussing the underlying state substantive law). Thus, under Virginia law, the prevailing party "must identify a specific statutory grant of authority that enables a court to award attorney's fees...." Russell County, 523 S.E.2d at 492. In the present case, there is no such grant of authority under which the Court may award attorney's fees. Furthermore, the Plaintiff has not shown that the Defendant acted in bad faith. See Ga. Code Ann. § 13-6-11. Accordingly, althoughthe Fourth Circuit has not directly ruled on this issue, it does not appear that the Fourth Circuit would permit an award of attorneys' fees in this case. Even assuming arguendo that the Fourth Circuit would allow an award of attorneys' fees in this case, as perhaps the Tenth Circuit might, the ultimate decision is still left to the discretion of the Court. Here, the Court finds that Defendant was justified in seeking to enforce what it believed to be valid restrictive covenants in the Franchise Agreement and Non-Competition Agreement and declines to award attorneys' fees.

Plaintiff further requests an award of costs. Hamden states that the Virginia Declaratory Judgment Act, Va. Code Ann. 8.01-190, provides that "costs, or such part thereof as the court may deem proper and just in view of the particular circumstances of the case, may be awarded to any party." The Court does not believe the Virginia Declaratory Judgment Act governs here because in federal proceedings the Federal Declaratory Judgment Act governs. See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County, 415 U.S. 423, 437 (1974). However, which Declaratory Judgment Act applies does not change the result, as under either standard the determination is left to the discretion of the court. As stated above, Defendant did not pursue its case in bad faith and was justified in seeking to enforce what it believed to be valid restrictive covenants. Accordingly, the Court declines to award costs to Plaintiff.

## IV. Conclusion

For the foregoing reasons, the Court enters judgment in favor of Plaintiff. Plaintiff did not terminate the Franchise Agreement and nor does he perform paint restoration. Thus he is not bound by any of the restrictive covenants in the Franchise Agreement or Non-Competition Agreement. However, the Court declines to award Plaintiff the requested attorneys' fees and costs. An appropriate Judgment shall this day issue.

ENTER: This _7th_ day of August, 2012

_____
Senior United States District Judge